IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| TELINIT TECHNOLOGIES, LLC, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **vs.** | § | |
| | § | **CIVIL ACTION NO. 2:14-CV-369** |
| ALTEVA, INC., *et al.*, | § | **(LEAD CASE)** |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

This Memorandum Opinion construes the disputed claim terms in United States Patent Number 6,192,123. Also before the Court is Defendant Jive Communications, Inc.'s ("Jive") Motion and Supporting Brief for Judgment on the Pleadings (Docket No. 41). On July 21, 2015, Plaintiff Telinit Technologies, LLC and Jive presented arguments on the disputed claim terms and Jive's Motion for Judgment on the Pleadings. For the reasons discussed below, the Court resolves the claim term disputes as stated below and **GRANTS** Jive's Motion for Judgment on the Pleadings (Docket No. 41).

## BACKGROUND

Plaintiff Telinit Technologies, LLC's ("Telinit") alleges that the only remaining defendant, Jive Communications, Inc. ("Jive"), infringes United States Patent Number 6,192,123 (" '123 Patent"). The '123 Patent—entitled "Method and Apparatus for Initiating Telephone Calls Using a Data Network"—generally relates to technology for placing and receiving network-based telephone calls. *See* '123 Patent.

# CLAIM CONSTRUCTION

## APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' " *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The Court examines a patent's intrinsic evidence to define the patented invention's scope.  *Id.* at 1313–14; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Intrinsic evidence includes the claims, the rest of the specification and the prosecution history.  *Phillips*, 415 F.3d at 1312–13; *Bell Atl. Network Servs.*, 262 F.3d at 1267.  The Court gives claim terms their ordinary and customary meaning as understood by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–3; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms.  *Phillips*, 415 F.3d at 1314.  "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent."  *Id.*  Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.' " *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* (quoting *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex. Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope.  *Phillips*, 415 F.3d at 1316.  Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001).  This presumption does not arise when the patentee acts as his own lexicographer.  *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone."  *Teleflex, Inc.*, 299 F.3d at 1325.  For example, "[a] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct."  *Globetrotter Software, Inc. v. Elam Computer Group Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) (quoting *Vitronics Corp.*, 90 F.3d at 1583).  But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during prosecution of the patent.  *Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent").  The

well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).  The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance.  *Middleton Inc. v. 3M Co.*, 311 F.3d 1384, 1388 (Fed. Cir. 2002); *see also Springs Window*, 323 F.3d at 994 ("The disclaimer . . . must be effected with 'reasonable clarity and deliberateness.'") (citations omitted)).  "Indeed, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover." *Spectrum Int'l v. Sterilite Corp.*, 164 F.3d 1372, 1378–79 (Fed. Cir. 1988) (quotation omitted).  "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although "less significant than the intrinsic record in determining the legally operative meaning of claim language," the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted).  Technical dictionaries and treatises may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent.  *Id.* at 1318.  Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.*  Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The patent in suit may contain means-plus-function limitations that require construction. Where a claim limitation is expressed in means-plus-function language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112 ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, § 112 mandates that "such a claim limitation be construed to cover the corresponding structure…described in the specification and equivalents thereof." *Id.* (citing 35 U.S.C. § 112 ¶ 6.). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves two inquiries. The first step requires "a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A structure is corresponding "only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the corresponding structure inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## ANALYSIS

At issue are claim terms from claims 1–2 and 4–8 from the '123 Patent. On July 21, 2015, the Court circulated preliminary claim constructions meant to indicate where it stood after considering the claim construction briefing, and stated that it might change its position based

upon the parties' arguments at the claim construction hearing.   Docket No. 71 at 3:16–18 ("*Markman* Hr'g Tr.").

## I.   Agreed Terms

On July 20, 2015, the parties filed a notice stating they reached an agreement regarding the construction of two claim terms.   Docket No. 66.   Also, based on the Court's preliminary claim constructions, the parties reached an agreement with respect to the term "means configured to provide a web page for user input and request selection."   *Markman* Hr'g Tr. at 3:16–4:5.

| Claim Terms | Agreed Claim Construction |
|---|---|
| data network request | a network request sent via a data network, which is a TCP/IP network designed to transfer information encoded as digital data signals |
| signaling component | a server that sends an electronic signal to a telephone switch |
| means configured to provide a web page for user input and request selection | means-plus-function term: the claimed function is "to provide a web page for user input and request selection," and the corresponding structure is "web server 210, and equivalents thereof" |

In view of the parties' agreement on the proper construction of the above identified terms, the Court **ADOPTS** these constructions.

## II.   Disputed Terms

### 1.   "voice network"

| Telinit's Proposed Construction | Jive's Proposed Construction |
|---|---|
| a telephone network capable of conveying speech encoded as voice signals | a public switched telephone network designed to transfer information encoded as analog voice signals |

The parties dispute whether "voice network" should be construed to require all voice transmissions be encoded as analog signals or that a public switched telephone network

("PSTN") exclusively transfer voice transmissions, and exclude other voice networks such as a private exchange branch ("PBX") or cellular networks that work as voice networks.  Telinit argues that "the specification indicates that although the claimed invention uses a [PSTN,] other voice-based networks may be used."  Docket No. 54 at 8 (citing '123 Patent at 4:17–20).  Telinit also states that the prosecution history clarifies that interchanging a PSTN with a PBX was known in the art, and a "voice network" would not be exclusively limited to the PSTN.  *Id.* at 9. Further, Telinit argues that "[t]he specification does not disclose or suggest that voice data must be exclusively 'encoded in analog voice signals,' as required by [Jive]'s construction."  *Id.* Telinit further contends that "neither the claims nor the specification disclose or suggest that all voice transmissions need to be encoded as analog signals."  Docket No. 57 at 3.  Telinit argues that "although the PBX may be connected to a PSTN, it is separate and distinct from the PSTN." *Id.* at 4.

Jive responds that "[t]he term 'voice network' is never used in the specification.  Rather, the specification only refers to PSTNs."  Docket No. 58 at 10.  Jive argues that whereas "audio, or voice, is associated with uncompressed, or un-digitized, analog signals," "data is associated with digital information."  *Id.* at 11 (citing '123 Patent at 2:19–33).  Jive concludes that "a voice transmission only becomes a data transmission if it is converted to digital information."  *Id.*

The Background of the Invention section states that:

> Although the Internet was originally designed for data transmission, it is now a host for voice transmissions as well.  For example, audio interface software like NetPhone from Electric Magic Company enables phone-like connections over the Internet. NetPhone operates by compressing audio and sending it over a TCP/IP connection as digital information.

'123 Patent at 2:18–24.  The Summary of the Invention discusses:

> Systems consistent with the present invention, as embodied and
> broadly described herein, overcome the limitations due to the prior
> art by integrating equipment of existing telephone companies with
> the Internet to provide enhanced telephone services on a *public
> switched telephone network* via requests from the Internet.

*Id.* at 2:61–66 (emphasis added).  The specification further discloses:

> The present invention may be implemented by computers and
> telephone switching equipment.   The architecture for and
> procedures to implement this invention, however, are not
> conventional, because they provide enhanced telephone services on
> a system that *blends features of the Internet with a public switched
> telephone network*.

*Id.* at 3:40–45 (emphasis added); *see also id.* at 3:47–49 and 3:65–67 ("A telephone service

system 130 connects the Internet to a public switched telephone network that in turn connects

multiple telephones 140a through 140d.").

During prosecution, Telinit submits that the examiner identified a PBX as relevant:

> With respect to the remarks of the response…the examiner does
> not agree that Foladare does not teach the step of identifying the
> stored telephone number, through use of the parameter the PBX is
> caused to connect the representative[']s telephone and thus there is
> a stored telephone number at least associated with the parameter
> used, the telephones 22, 24,[]26 as taught connect through the
> PBX, each telephone has a telephone number, the parameter
> referred to merely identifies the representative at a particular
> telephone of the PBX and so the parameter refers to a stored
> telephone number to connect to the PBX.  Further it is questionable
> as to what the remarks suggest one of ordinary skill in the art
> would use to connect two telephones if not by use of two different
> telephone numbers.

Docket No. 54, Ex. II, Final Office Action at 2 (p. 164 of Ex. II) (United States Patent Number

5,907,547 ("Foladare")).

The examiner also referred to "signaling a switch to make a call on the *voice network

(PSTN).*"  *Id.*, 12/21/99 Office Action at 2 (p. 121 of Ex. II) (emphasis added).  Although this

might be read as referring to "voice network" and "PSTN" as synonymous, an equally plausible reading is that the PSTN was set forth as an example of a voice network.

As to extrinsic evidence, Jive submits a technical dictionary definition of "data network" as "[a] network designed to transfer data that is usually encoded as digital signals, as opposed to a voice network, which *usually* transmits analog signals."  Docket No. 58, Ex. 4, *Microsoft Press Computer Dictionary* 109 (emphasis added).[1]  "[U]sually" highlights that use of analog or digital communications is a feature of particular implementations that should not be imported into the construction of the seemingly generic term "voice network."

Jive also submits evidence that a PBX is a node, in communication with a PSTN, that has multiple private extensions that can be connected to each other and to the PSTN.  *See* Docket No. 58, Ex. 5, *Webster's New World Dictionary of Computer Terms* 330;[2] *see also id.*, Ex. 1, Foladare at 4:24–29 ("[S]erver 14 can direct private branch exchange 34 to set up a telephone call between the customer service representative and the customer via public switched telephone network 36 and local exchange carrier 18.  The call is established over lines 37.").  If anything, however, this merely reinforces that a PBX is a type of voice network that is distinct from a PSTN.

In sum, Jive's proposals of a "public switched telephone network" and "analog" voice signals lack sufficient support.  Instead, these are features of "particular embodiments appearing in the written description [that] will not be used to limit claim language that has broader effect." *Innova/Pure Water*, 381 F.3d at 1117; *accord Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly

---

[1] Defendant has not provided the edition or year of publication information for this dictionary.  *See* Docket No. 58, 6/9/2015 Cuneo Decl. at ¶ 5.

[2] Defendant has not provided the edition or year of publication information for this dictionary.  *See* Docket No. 58, 6/9/2015 Cuneo Decl. at ¶ 6.

warned against confining the claims to those embodiments."). Accordingly, the Court construes **"voice network"** as **"a telephone network capable of conveying speech encoded as voice signals."**

### 2. "instrument"

| Telinit's Proposed Construction | Jive's Proposed Construction |
| --- | --- |
| terminal device that is capable of at least receiving a voice call | a telephone connected to a public switched telephone network |

The parties dispute whether the term "instrument" should be construed to require a specifically identified device to connect through a PSTN. Telinit argues that "the instrument identified by the user telephone number is merely required to be able to connect to the call, without any reference to signaling a switch." Docket No. 54 at 11. Telinit contends that "the specification discloses certain audio interface software capable of enabling phone-like connections over the Internet." *Id.* Telinit argues that the specification does not exclude "phone-like" Internet communications because "at the time of the invention it was known in the art to exchange signals between a computer and a telephone in a PSTN or similar voice-based network." Docket No. 57 at 4. Finally, Telinit argues that prosecution history "shows that it was known in the art to exchange signals between a computer and a telephone in a PSTN or similar voice-based network." Docket No. 54 at 11. Jive responds that "[t]he specification only describes the telephones as connected to a PSTN." Docket No. 58 at 13.

The parties discuss claims 1, 2, 5 and 6, which recite (emphasis added):

> 1. A method for initiating telephone calls on a voice network in response to requests from a data network comprising the steps, performed by a processor, of:
>     receiving a data network request to initiate a telephone call, including a user telephone number;
>     identifying a stored telephone number corresponding to the request;

signaling a switch to make a call on the voice network to an *instrument* identified by the stored telephone number;
monitoring a status of the call; and
providing a user with an indication of a change in the status of the call.

2.  The method of claim 1, wherein the signaling step includes the substep of:
connecting an *instrument* identified by the user telephone number to the call.

\* \* \*

5.  A system for initiating telephone calls on a voice network in response to requests from a data network comprising:
an input component configured to receive a data network request to initiate a telephone call, including a user telephone number;
a processing component configured to identify a stored telephone number corresponding to the request;
a signaling component configured to signal a switch to make a call on the voice network to an *instrument* identified by the stored telephone number;
a monitoring component configured to monitor a status of the call; and
a status component configured to provide a user with an indication of a change in the status of the call.

6.   The system of claim 5, wherein the signaling component includes:
means configured to connect an *instrument* identified by the user telephone number to the call.

'123 Patent at 9:41–10:10 and 10:18–34.

As Telinit urges, the recitations of merely "connect[ing] an instrument" do not require that the "instrument" be able to signal a switch.  Instead, such functionality is recited as, for example, part of the "signaling component" in above-quoted claim 5.

The specification discusses voice communication using systems other than a public switched telephone network:

Although the Internet was originally designed for data transmission, it is now a host for voice transmissions as well.  For example, audio interface software like NetPhone from Electric Magic Company enables *phone-like connections over the Internet*. NetPhone operates by compressing audio and sending it over a TCP/IP connection as digital information.  According to Electric Magic, NetPhone interfaces with Netscape, allows multiple active calls, and provides caller ID service.  The major advantage of this type of technology is that it permits users to make telephone calls that bypass telephone companies and their charges for calls.

The Internet, however, is designed for data transmission, not voice.  Thus, the quality of voice transmission on the Internet is typically not very good.

The ability to communicate easily may be the underlying reason for the Internet's enormous success. But not all communications schemes have enjoyed the same kind of success.

For example, telephone conferencing, where at least three parties in different locations are included in a single telephone conversation, has been available for many years.  At first, the telephone company provided conferencing as a service for a fee.  In this case, the customer provided the telephone numbers for those to be included in a conference call, and the company connected the conference call.  Later, *conference calling became a feature of PBX systems*, which are typically used by larger organizations with many phones.

Additionally, some people repeatedly make conference calls to the same group.  This means that they have to go through the same routine with a telephone company (i.e., specifying the same telephone numbers for the call) each time they wish to make a conference call.  Alternatively, companies can provide an added service of storing this information.  The typical PBX system does not provide such a storage feature or eliminate the need for the user to dial each telephone number for the group every time he wishes to make a conference call.

*Id.* at 2:17–55 (emphasis added).

Although these disclosures appear to explain that the claims of the '123 Patent are directed to something different than, for example, NetPhone, Jive has not shown that the specification warrants imposing a "telephone" or "public switched telephone network"

limitation.  Thus, the Court construes **"instrument"** to mean **"terminal device that is capable of at least receiving a voice call."**

### 3. "user telephone number"

| Telinit's Proposed Construction | Jive's Proposed Construction |
|---|---|
| a number identifying the user responsible for sending the data network request | a set of numerical digits that identify a particular node within a public switched telephone network |

The key dispute for "user telephone number" is whether or not the term is construed to require that it be identified with a specific device within a PSTN.  Telinit argues that "the instrument associated with the 'user telephone number' does not have to be on the voice network and does not have to be connected to the call by signaling a switch."  Docket No. 54 at 13. Telinit further argues that "the claim language does not require the 'user telephone number' to be connected via the PSTN and the intrinsic evidence shows that connecting instruments on the Internet with telephones on a voice network was already known in the art."  Docket No. 57 at 5.

Jive responds that "[Telinit]'s construction is improper because it would include account numbers and IP addresses, both of which are specifically distinguished from telephone numbers by the specification."  Docket No. 58 at 14.  Jive argues that Telinit's proposal "does not account for the distinction that would have been understood by a PHOSITA [(person having ordinary skill in the art)] at the time of filing the patent between computers and telephones."  *Id.* at 15. Jive contends the prosecution history supports construing "user telephone number" more narrowly.  *Id.*  Jive argues that during prosecution the patentees distinguished the '123 Patent over the prior art because the patentees argued that the '123 Patent was distinguishable for "including a user telephone number in the request."  *See id.*

The specification defines a "user" as "one who initiates a call." '123 Patent at 4:43–44. The specification also refers to "audio interface software" that "enables phone-like connections over the Internet." *Id.* at 2:19–21.

During prosecution, the patentees discussed the "Rondeau" reference (United States Patent No. 5,850,433), and Telinit submits that Rondeau demonstrates that "it was known in the art, at the time of the present invention, to exchange signals between a computer and a telephone in a PSTN or similar voice-based network." Docket No. 54 at 11 (citing Rondeau at 6:29–48 and Fig. 1).

Jive emphasizes the patentees' statement that "Rondeau does not disclose, teach or suggest the aspect of including a user telephone number in the request." Docket No. 54, Ex. II, 10/7/1999 Amendment at 6 (p. 112 of Ex. II). Having distinguished Rondeau, Jive concludes that Telinit's proposed construction is overbroad because Rondeau "disclosed a computer-to-telephone call, which supplies the IP address (*i.e.*, a number identifying the user) of the computer 18 to the terminal server 26 and directs telephony server 30 to dial the telephone device 22." Docket No. 58 at 15 (citing *id.*, Ex. 2, Rondeau at 5:23–6:67).

On balance, the prosecution history contains no definitive statements regarding "telephone number" that would warrant any finding of disclaimer. *See Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution.") (emphasis added); *id.* at 1325–26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both *clear and unmistakable*.") (emphasis added).

14

Further, Jive's proposal of requiring a "public switched telephone network" should be rejected for substantially the same reasons as for other disputed terms, such as "voice network," discussed above.

Nonetheless, the constituent term "telephone" should be given meaning by requiring a location within a voice network.  The specification also confirms that a telephone number is distinct from an account number:

> After the user inputs the telephone number, the "call me now" request is complete.   The user then instructs browser 320 to transmit the request to web server 210.  When a complete "call me now" request (including an *account number* ("ACCOUNT_NUM["]) and *phone number* ("PHONE_NUM")) is received (step 430), web server 210 accesses database 230 to verify that the received *account number* corresponds to a stored customer *account number* (step 440), and retrieves from database 230 a *telephone number* for the customer ("CUSTOMER_NUM") (step 450).

'123 Patent at 5:40–50 (emphasis added).   Accordingly, the Court construes **"user telephone number"** to mean **"a set of numerical digits that identify a particular node within a voice network."**

### 4.  "switch"

| Telinit's Proposed Construction | Jive's Proposed Construction |
| --- | --- |
| plain and ordinary meaning | a telephone switch that selectively makes or breaks an analog electrical circuit connection (i.e., a call) between two nodes in a public switched telephone network |

The parties dispute whether the term "switch" should be construed as having its plain and ordinary meaning.   Telinit argues that "the switch serves the purpose of making calls to an instrument on the voice network," and because "[t]his is nothing more than the plain and ordinary meaning of the term 'switch' . . ., it should be construed accordingly."   Docket No. 54 at 14.   Telinit submits that Jive "merely inserts a plurality of limitations to the term 'switch'

without actually defining it." *Id.* at 15.  Telinit argues that Jive's proposal is "based solely upon extrinsic evidence" and is inconsistent with disclosure in the specification that PBX systems and similar voice-based networks are suitable for the exchange of voice data.  *Id.* (citing '123 Patent at 2:36–55).  Finally, Telinit argues that "nothing in the claims or specification of the '123 Patent requires the PSTN to work exclusively with 'analog voice signals' and Jive has not identified any relevant evidence disclosing or suggesting that PSTNs, or similar voice networks, are required to exclusively transfer analog signals." *Id.* at 15–16.

Jive responds that "[Telinit] fails to distinguish between switches that make up the Internet infrastructure and switches that make up PSTNs, in contrast to the specification." Docket No. 58 at 16.  Jive replies by reiterating that "Defendant defines the term 'switch' by using a circular construction that uses the claim term within the definition, but does not actually define the term."  Docket No. 57 at 5.  Telinit also urges that "[Jive] repeats its misplaced assertion that a PBX is not is not [*sic*] distinct from a PSTN." *Id.* at 6.

The specification discloses a "telephone switch":

> The server . . . signals the *telephone switch* to make calls on a public switched telephone network in accordance with user requests.
>
> \* \* \*
>
> FIG. 2 is a block diagram of the components of telephone service system 130.  System 130 includes a web server 210, a *telephone switch 220*, and a database 230.  Web server 210 and *switch 220 may be conventional hardware*.

'123 Patent at 3:54–56 & 4:8–11 (emphasis added).

Nonetheless, Jive's proposals of requiring an "analog" connection and a "public switched telephone network" should be rejected for substantially the same reasons as for other disputed terms, such as "voice network," discussed above.

Some construction, however, is appropriate to assist the finder of fact in understanding the disputed term. *See TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J.) ("The Court believes that some construction of the disputed claim language will assist the jury to understand the claims."). Thus, the Court construes **"switch"** to mean **"a device that can selectively make or break a connection between nodes in a voice network."**

### 5. "input component"

| Telinit's Proposed Construction | Jive's Proposed Construction |
| --- | --- |
| a server that receives one or more packets on a data network requesting a service | a server that receives information generated by a user[3] |

Both parties agree that the term "input component" is a server that receives data (i.e., information), however the parties disagree as to the type of data the server is required to receive. Telinit argues that "there is no requirement in the claims or the specification requiring the 'input component' to receive information other than the user telephone number received as part of the request." Docket No. 54 at 16–17.

Jive responds that, in light of the specification, "a PHOSITA [(person having ordinary skill in the art)] would not have understood the term input component to be limited to a server that receives packets." Docket No. 58 at 17–18. Telinit replies that the alternative construction proposed by Jive "would still require the input component to receive information generated by the user, which is an improper limitation…." Docket No. 57 at 7.

Claims 5 and 7 recite (emphasis added):

> 5. A system for initiating telephone calls on a voice network in response to requests from a data network comprising:

---

[3] Jive also submits: "Jive does not object to a combined construction of input component along the lines of 'a server that receives information generated by a user comprising one or more packets on a data network requesting a service.'" Docket No. 58 at 18.

an *input component* configured to receive a data network request to initiate a telephone call, including a user telephone number;

a processing component configured to identify a stored telephone number corresponding to the request;

a signaling component configured to signal a switch to make a call on the voice network to an instrument identified by the stored telephone number;

a monitoring component configured to monitor a status of the call; and

a status component configured to provide a user with an indication of a change in the status of the call.

\* \* \*

7.  The system of claim 5, wherein the *input component* includes:

means configured to provide a web page for user input and request selection.

The claims set forth no limitation requiring that the "input component" receive information generated by a user, and Jive has not adequately justified introducing such a limitation.  Further, the doctrine of claim differentiation weighs at least somewhat against including such a requirement in the construction of "input component" because dependent claim 7 adds a limitation that pertains to facilitating user input.  *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Jive's proposed construction should therefore be expressly rejected.  No further construction is necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a

patent's asserted claims."); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."). Thus, the Court construes **"input component"** to have its **plain meaning**.

### 6. "monitoring component"

| Telinit's Proposed Construction | Jive's Proposed Construction |
|---|---|
| a server that monitors call status for changes | a server that supervises or tracks information received from a switch regarding the statuses of electrical connections or telephone calls[4] |

The parties disagree as to the scope of what the server is required to monitor. Telinit argues that rather than being limited to "the statuses of electrical connections or telephone calls," as Jive proposes, "the specification indicates that the 'monitoring component' monitors the status of any change in the call." Docket No. 54 at 19. Further, Telinit reiterates that "the specification discloses that PBX systems are suitable for the exchange of voice data" and "the intrinsic evidence does not require the voice transmissions to be analog signals." *Id.* at 18 (citing '123 Patent at 2:36–55).

Jive responds that during prosecution the patentees specifically relied upon "checking for changes in connection." Docket No. 58 at 19. Jive also cites extrinsic definitions of "monitor" (quoted below). *Id.* Telinit replies that the alternative construction proposed by Jive "would still require the signaling component to send information to a telephone switch. As discussed above, Telinit argues this would be improper because the specification discloses that PBX systems are suitable for the exchange of voice data." Docket No. 57 at 8.

Claim 5 recites (emphasis added):

---

[4] Jive also submits that it "does not object to a combined construction of 'a server that monitors call status by supervising or tracking information received from a switch for changes regarding the statuses of electrical connections or telephone calls.' " Docket No. 58 at 19.

> 5.   A system for initiating telephone calls on a voice network in response to requests from a data network comprising:
>
> an input component configured to receive a data network request to initiate a telephone call, including a user telephone number;
>
> a processing component configured to identify a stored telephone number corresponding to the request;
>
> a signaling component configured to signal a switch to make a call on the voice network to an instrument identified by the stored telephone number;
>
> a *monitoring component* configured to monitor a status of the call; and
>
> a status component configured to provide a user with an indication of a change in the status of the call.

During prosecution, the patentees amended the claims by adding "monitoring" and "providing" steps in response to examiner rejections based on the Foladare reference.  *See* Docket No. 54, Ex. II, Final Office Action at 2 (p. 164 of Ex. II); *see also id.*, 3/20/2000 Amendment After Final at 2 (p. 167 of Ex. II).  The patentees stated:

> [T]he present invention, as recited in claim 1 for example, monitors a status of the call, *checking for changes in connection*. If there is a *change in connection*, the user is provided with an indication to that effect.  *There is nothing in Foladare et al. that suggests monitoring of this sort.*  Accordingly, Foladare et al. does not disclose or suggest monitoring a status of the call and providing the user with an indication of a change in the status of the call.

*Id.* at 4–5 (pp. 169-70 of Ex. II) (emphasis modified).  The patentees thus explicitly characterized "monitoring" as "checking for changes in connection," and the patentees expressly relied upon that characterization to distinguish Foladare.  This amounts to a definitive statement that should be given effect in the Court's construction.  *See Omega Eng'g*, 334 F.3d at 1324–26; *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent."); *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not

be construed one way in order to obtain their allowance and in a different way against accused infringers.").

The specification is consistent with referring to "changes" and to the "connection":

> Web server 210 also *monitors call status for changes* (step 560). This is done by *receiving signals from telephone switch 220 on the connection between the user and the customer.* If there is a *change in the connection*, for example, a party hangs up or otherwise ends the call (step 570), web server 210 generates a new web page to indicate the change, and transmits the new page to the user's browser (step 580). In this example, when a party hangs up the call is complete and, thus, the web page transmitted to the user indicates that the call is complete.

'123 Patent at 6:6–15 (emphasis added).

As to extrinsic evidence, Jive submits dictionary definitions of "monitor" that include "to track," "to keep watch over," and to "supervise." Docket No. 58, Ex. 10, *New Riverside Dictionary* 765.[5] This extrinsic evidence supports Jive's proposal of "supervises or tracks" but does not outweigh the use of the word "checking" in the prosecution history as set forth above.

Finally, Jive has not adequately supported its proposal of requiring "electrical" connections, and to whatever extent Defendant's proposal of the word "telephone" is intended as a reference to a PSTN, such a limitation should be rejected for substantially the same reasons as for other disputed terms, such as "voice network," addressed above. Accordingly, consistent with the above-discussed prosecution history, the Court construes **"monitoring component"** to mean **"a server that checks for changes in a connection."**

---

[5] Jive has not provided edition or year of publication information for this dictionary. *See* Docket No. 58, 6/9/2015 Cuneo Decl. at ¶ 11.

### 7.  "status component"

| Telinit's Proposed Construction | Jive's Proposed Construction |
|---|---|
| a server that provides an indication of a change in the status of the call | a server that communicates a change in the status of an analog electrical circuit connection (i.e., a call) to a user |

The parties disagree whether the term "status component" requires a construction wherein all voice transmissions must be encoded as analog signals.  Telinit contends that "neither the claims nor the specification disclose or suggest that the server is required to exclusively communicate a change in the status of an analog electrical circuit connection."  Docket No. 54 at 20.  Telinit reiterates that "neither the claims nor the specification disclose or suggest that all voice transmissions need to be encoded as analog signals."  Docket No. 57 at 8.  Much like "monitoring component," Jive contends that "status component" is not used in the specification and that the term monitors "changes in the connection" on an analog PSTN.  Docket No. 58 at 20.

The disputed term appears in claim 5, which is reproduced above in the discussion of the term "monitoring component."  The specification discloses:

> Web server 210 also monitors call status for changes (step 1030).  This is done by receiving signals from telephone switch 220 on the connection between the user and the customer.  If there is a change in the connection (step 1035), *web server 210 generates a new web page to indicate the change*, and transmits the new page to the user's browser (step 1040).

'123 Patent at 8:36–43; *see also id.* at 6:6–15 (quoted above as to the term "monitoring component").

As stated above, during prosecution the patentees amended the claims by adding "monitoring" and "providing" steps in response to examiner rejections based on the Foladare

reference.  *See* Docket No. 54, Ex. II, Final Office Action at 2 (p. 164 of Ex. II); *see also id.*,

3/20/2000 Amendment After Final at 2 (p. 167 of Ex. II).  The patentee stated:

> [T]he present invention, as recited in claim 1 for example,
> monitors a status of the call, checking for changes in connection.
> *If there is a change in connection, the user is provided with an
> indication to that effect.*  There is nothing in Foladare et al. that
> suggests monitoring of this sort.  Accordingly, Foladare et al. does
> not disclose or suggest monitoring a status of the call and
> providing the user with an indication of a change in the status of
> the call.

*Id.* at 4–5 (pp. 169–70 of Ex. II) (emphasis modified).  The patentees thus explicitly referred to

providing an indication of a "change in connection," and the patentees expressly relied upon that

characterization to distinguish Foladare.  This amounts to a definitive statement that should be

given effect in the Court's construction.  *See Omega Eng'g*, 334 F.3d at 1324–26; *see also*

*Typhoon Touch*, 659 F.3d at 1381; *Southwall*, 54 F.3d at 1576.

Finally, Jive has not adequately supported its proposal of requiring "electrical"

connections, and Jive's proposal of "analog" is rejected for substantially the same reasons as for

other disputed terms, such as "voice network," addressed above.   Accordingly, the Court

construes **"status component"** to mean **"a server that provides an indication of a change in a**

**connection."**

## 8.   "means configured to connect an instrument identified by the user telephone number to the call"

| Telinit's Proposed Construction | Jive's Proposed Construction |
| --- | --- |
| device functionality configured to emit an electronic signal to a device to connect a call to an instrument identified by the user telephone number | A telephone switch.   In particular, the telephone switch 220 of FIGS. 2 and 3. |

The parties dispute whether the term "means configured to connect an instrument

identified by the user telephone number to the call" should be construed as a

means-plus-function term with the requirement that the "instrument" connect to the call by means of a switch.  Telinit argues that this is not a means-plus-function term because "the structure associated to the function can be found in the language of the independent claim." Docket No. 54 at 23.  Telinit submits that the disputed term appears in dependent claim 6, which limits the "signaling component" recited in claim 5, but "[t]he signaling component has not been identified by Defendant as a means-plus-function limitation."  *Id.* at 24.  Telinit also submits that "the server in the claimed telephone service system constitutes a device or 'signaling component' functionality configured to emit an electronic signal to a device to connect a call to an instrument identified by the user telephone number."  *Id.*  Alternatively, Telinit argues that the claimed function is "connect[ing] an instrument identified by the user telephone number to the call" and the corresponding structure is a web server.  *Id.* at 25 (square brackets Telinit's).  Telinit concludes that "the instructions in the server are the means by which the server connects an instrument identified by the user telephone number to the call."  *Id.* at 26.

Jive responds that "claim 6 uses the term 'means' and [35 U.S.C.] § 112, ¶ 6 clearly applies."  Docket No. 58 at 21.  Jive agrees that the claimed function is "to connect an instrument identified by the user telephone number to the call."  *Id.* at 22.  Jive submits:

> The structure disclosed in the specification corresponding to this function is "System 130 includes…a telephone switch 220…[that] may be conventional hardware…[t]elephone switch 220 may be, for example, model VCO80, manufactured by Suma Four Inc."

Docket No. 58 at 22 (quoting '123 Patent at 4:9–16) (ellipses and square brackets Jive's).

Telinit replies that Jive failed to address that "claim 5[] provides the structure necessary to perform the recited function."  Docket No. 57 at 9.  As to Jive's proposed construction, Telinit replies that "limiting the claimed invention to exemplary embodiments violates well-settled principles of claim construction."  *Id.*

Claim 6, in which the disputed term appears, depends from claim 5.  Claims 5 and 6 recite (emphasis added):

> 5.   A system for initiating telephone calls on a voice network in response to requests from a data network comprising:
>> an input component configured to receive a data network request to initiate a telephone call, including a user telephone number;
>> a processing component configured to identify a stored telephone number corresponding to the request;
>> a signaling component configured to signal a switch to make a call on the voice network to an instrument identified by the stored telephone number;
>> a monitoring component configured to monitor a status of the call; and
>> a status component configured to provide a user with an indication of a change in the status of the call.
>
> 6.   The system of claim 5, wherein the signaling component includes:
>> *means configured to connect an instrument identified by the user telephone number to the call.*

Title 35 U.S.C. § 112, ¶ 6[6] provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  The presence of the word "means" in the disputed term gives rise to a presumption that this is a means-plus-function term:

> It is well settled that [a] claim limitation that actually uses the word "means" invokes a rebuttable presumption that [35 U.S.C] § 112, ¶ 6 applies.  By contrast, a claim term that does not use "means" will trigger the rebuttable presumption that § 112, ¶ 6 does not apply.  The term "means" is central to the analysis.

---

[6] The Leahy-Smith America Invents Act ("AIA") modified former 35 U.S.C. § 112, ¶ 6 such that the statute can now be found at 35 U.S.C. § 112(f).  It appears that the pre-AIA version applies to the patents-in-suit, but regardless the amendment has no effect on the analysis.

*Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371–72 (Fed. Cir. 2003) (citations and internal quotation marks omitted); *see Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) ("the use of the word 'means' in a claim element creates a rebuttable presumption that [35 U.S.C.] § 112, para. 6 applies").

Rather than demonstrating that the words of the claim impart structural meaning, Telinit relies upon structures disclosed in the specification. Although Telinit cites the "signaling component" recited in claim 5, claim 6 recites that the signaling component *includes* the "means," not that the signaling component *is* the "means." Telinit fails to rebut the presumption that the disputed term is a means-plus-function term.

As to the proper construction, the parties agree, as noted above, that the claimed function is "to connect an instrument identified by the user telephone number to the call." *See* Docket No. 54 at 23; *see also* Docket No. 58 at 22.

As for the corresponding structure, Telinit argues that the web server is disclosed as connecting an instrument to a call. The specification discloses, however, that this function is performed by "telephone switch 220":

> Web server 210 then initiates a call to the user's input telephone number (step 460). This step involves *signaling telephone switch 220 to make to* [*sic*] *the call*. Telephone switch 220 notifies web server 210 when the user is on the line (step 470), e.g., the user picked up the handset of the telephone, so web server 230 can play a recorded message selected by the customer (step 480).
>
> * * *
>
> Web server 210 then initiates a call to the customer's telephone number by *signaling telephone switch 220 to make the call* (step 520). Once web server 210 receives confirmation from telephone switch 220 that the customer is on the line (step 530), web server 210 *sends a signal to connect the call* between the user and the customer (step 540).

26

* * *

> Next, web server 210 initiates a call to a first party to the conference call selected from the group (step 1135).  When the other party receives the call, telephone switch 220 sends a signal to web server 210 that, in turn, *sends a signal to telephone switch 220 to connect the call* (step 1140).

'123 Patent at 5:51–6:2 & 9:6–10 (emphasis added); *see id.* at 3:46–56 ("The server then signals the telephone switch to make calls on a public switched telephone network in accordance with the user requests.") and 8:31–33 ("web server 210…sends a signal to telephone switch 220 to connect the call").

Although the above-quoted passages disclose, for example, that "web server 210 sends a signal to connect the call," the disclosures explain that the "signal" is sent to telephone switch 220, which is the structure that actually performs the function of connecting the call.  Thus, the Court construes **"means configured to connect an instrument identified by the user telephone number to the call"** as a means-plus-function term, and the function is **"to connect an instrument identified by the user telephone number to the call,"** with the corresponding structure being a **"telephone switch 220, and equivalents thereof."**

## CONCLUSION

For the foregoing reasons, the Court construes the claim language in this case in the manner set forth above.  For ease of reference, the Court's claim constructions are set forth in a table in Appendix A.  The parties are ORDERED that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ORDERED to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

## MOTION FOR JUDGMENT ON THE PLEADINGS

Jive moves for judgment on the pleadings on the grounds that claims 1–8 of the '123 Patent are invalid for failure to claim patentable subject matter under 35 U.S.C. § 101. Independent claim 1 is a method claim comprising of five elements. '123 Patent at 9:41–10:6. Claims 2 through 4 are method claims that depend from claim 1. *Id.* at 10:7–17. Independent claim 5 is a system claim comprising of five elements. *Id.* at 10:18–32. Claims 6 through 8 are system claims that depend from claim 5. *Id.* at 10:33–45.

## APPLICABLE LAW

### I.   Motion for Judgment on the Pleadings

A motion for judgment on the pleadings provides the Court with a method for summary adjudication of a claim or defense after the pleadings are closed, but before trial. *See* FED. R. CIV. P. 12(c). The standard under Rule 12(c) is the same as that under a Rule 12(b)(6) motion to dismiss. *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007). The Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *Id.* Thus, the Court determines whether the pleadings allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### II.   Patent-Eligible Subject Matter

Section 101 of the Patent Act defines patentable subject matter as "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and

requirements of this title." 35 U.S.C. § 101.  "Congress took this permissive approach to patent eligibility to ensure that ingenuity should receive liberal encouragement." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010) (internal quotes omitted).  Supreme Court precedent carves out three specific exceptions to the broad patentability principles set forth under § 101: laws of nature, physical phenomena, and abstract ideas.  *Id.*  These exceptions represent "the basic tools of scientific and technological work." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)).  " 'Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it,' thereby thwarting the primary object of the patent laws." *Id.* (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1303 (2012)).  Accordingly, courts must distinguish between patents that claim the "building blocks of human ingenuity and those that integrate the building blocks into something more." *Id.* (quoting *Mayo*, 132 S. Ct. at 1303).

The Supreme Court set forth a two-part test for patent eligibility.  *Alice*, 134 S. Ct. at 2355.  First, the Court determines whether the claims at issue are directed towards one of the three patent-ineligible concepts.  *Id.*  If so, then the Court then asks "what else is there in the claims before us?" *Id.* (quoting *Mayo*, 132 S. Ct. at 1296–97).  To answer the second question, the Court considers "the elements of each claim both individually and as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Id.* (internal quotations omitted).  The second step is a search for an "inventive concept"—"an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.' " *Id.* (quoting *Mayo*, 132 S. Ct. at 1298).

## ANALYSIS

Jive contends that claim 1 is representative of all the claims in the '123 Patent.  Docket No. 31 at 9.  Nonetheless, Jive argues that all the claims in the '123 Patent are invalid under § 101 for three reasons: (1) the claims are directed to an abstract idea; (2) the claims do not contain any inventive limitations; and (3) the claims fail the machine and transformation test. *See* Docket No. 31.

### I.    Patent-Eligibility of Claim 1 from the '123 Patent

Claim 1 recites:

> 1.  A method for initiating telephone calls on a voice network in response to requests from a data network comprising the steps, performed by a processor, of:
>> receiving a data network request to initiate a telephone call, including a user telephone number;
>> identifying a stored telephone number corresponding to the request;
>> signaling a switch to make a call on the voice network to an instrument identified by the stored telephone number;
>> monitoring a status of the call; and
>> providing a user with an indication of a change in the status of the call.

'123 Patent at 9:40–10:6 (emphasis added).

### A.  Abstract Idea

The parties dispute whether claim 1 is directed to an abstract idea.  Jive contends that claim 1 of the '123 Patent is patent-ineligible because it recites "[an] abstract idea of using an intermediary to place and monitor telephone calls."  Docket No. 9.  Telinit responds that claim 1 is not abstract because it recites a structural element—i.e., computer components and a "data network."  Docket No. 41 at 13.  Additionally, Telinit contends that claim 1 "address[es] a challenge particular to the Internet, namely, monitoring telephone calls initiated on the Internet and connecting telephone devices on the Internet to devices on the legacy telephone network."

*Id.* at 14.  Telinit relies on the Federal Circuit's decision in *DDR Holdings* to argue that the challenge is particularized to the Internet.  *Id.* at 13–14 (citing *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)).

In *DDR Holdings*, the Federal Circuit found the asserted patent addressed a problem specific to the Internet—retaining website visitors on a website.  *DDR Holdings*, 773 F.3d at 1257.  The Federal Circuit drew a careful distinction between the asserted claims in *DDR Holdings* and claims that "merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform [them] on the Internet."  *Id.* Contrary to Telinit's assertion, claim 1 describes a well-known and widely-understood concept— making a telephone call—and then applies that concept to the Internet using conventional computer components as an intermediary to place and monitor the telephone calls.  *See Alice*, 134 S. Ct. at 2352 ("[M]erely requiring generic computer implementation fails to transform that abstract idea into a patent-eligible invention.").  *DDR Holdings* is thus distinguishable from the present case.

Claim 1 is more analogous to the claims from the asserted patent in *Dick's Sporting Goods*.  *See Clear with Computers, LLC v. Dick's Sporting Goods, Inc.*, 21 F.Supp.3d 758 (E.D. Tex. 2014).  Claim 1 contains five elements that require: (1) receiving a data network request; (2) identifying a telephone number associated with that request; (3) signaling a switch to make a call; (4) monitoring the call; and (5) providing a user with notifications if there is a change in status of the call.  *See* '123 Patent at 9:41–10:6.

Telinit asserts Jive's argument—that claim 1 is abstract because human beings could perform the steps—is faulty "because a human being would be unable to receive a 'data request' or monitor a telephone call originating from the Internet."  Docket No. 41 at 18–19.  However, as

previously stated, taking an otherwise abstract idea and applying it to the Internet does not transform the claim into patentable subjection matter.  Remaining, then, are "receiving a data network request" and "monitoring a status of the call," which are tasks that human beings, such as telephone operators, have been doing for the past century.  *See Dick's Sporting Goods*, 21 F.Supp.3d at 765.

Telinit argues further that "the computer does not act as an intermediary in the same sense that a telephone operator does."  Docket No. 41 at 19.  Telinit asserts that the computer acts as a "gateway through which the call will be directed from the network through the telephone lines."  However, Telinit's broad assertion is precisely the function of a telephone operator.  Claim 1 does not contain any specific structural components—beyond a generic "processor" and generic "networks"—that remove it from the realm of an abstract idea.  *See* '123 Patent at 9:41–10:6.  Accordingly, claim 1 of the '123 Patent is directed towards an abstract idea.[7]

### B.  Inventive Concept

While claim 1 from the '123 Patent is directed to an abstract idea, it may still be patentable if it contains an "inventive concept."  *See Alice*, 134 S. Ct. at 2355.  Jive contends that claim 1 does not contain such an "inventive concept" because "[t]he only limitations besides the patent-ineligible mental steps are the computer-related aspects of the claims," which are generic components and do not transform claim 1 into patentable subject matter.  Docket No. 31 at 11–12.  Telinit responds that the interaction between "two networks, a data network, and a switched telephone network," are "a clear inventive step over the prior art."  Docket No. 41 at 20.  Telinit argues claim 1 specifies how a processor manipulates "interactions between a web

---

[7] Telinit's arguments concerning how claim 1 specifies "interactions between a web server and a public switched telephone network (PSTN)" discloses the claim's application of the abstract idea, and are best considered in the second step of the analysis.  *See* Docket No. 41 at 14.

server and a public switched telephone network (PSTN)…to establish and monitor telephone calls through a data network." Docket No. 41 at 14. Telinit also argues that the use of the Internet is inventive because "the computer in the '123 Patent signals a telephone switch and effectively connects the call initiated from the Internet to the desired voice network." *Id.* at 22.

However, even accepting the structures and corresponding functions identified by Telinit as those most favorable to Telinit, none, taken individually or in combination, transform claim 1 so as to cover an inventive concept. The primary structures identified by Telinit result in nothing more than generic computer and Internet based elements—"processor" and "networks." Moreover, claim 1 does not direct the generic elements to a specific application beyond "receiving," "identifying," "signaling," "monitoring," or "providing" information. Consequently, claim 1 does not contain any transformative elements, either alone or in combination, that transforms its abstract idea into patentable subject matter. Accordingly, claim 1 of the '123 Patent is invalid for failure to recite patent-eligible subject matter under 35 U.S.C. § 101.

## II.     Patent-Eligibility of Claim 5 from the '123 Patent

Claim 5 recites:

> 5.  A system for initiating telephone calls on a voice network in response to requests from a data network comprising:
> an input component configured to receive a data network request to initiate a telephone call, including a user telephone number;
> a processing component configured to identify a stored telephone number corresponding to the request;
> a signaling component configured to signal a switch to make a call on the voice network to an instrument identified by the stored telephone number;
> a monitoring component configured to monitor a status of the call; and
> a status component configured to provide a user with an indication of a change in the status of the call.

'123 Patent at 10:33–36.

### A.  Abstract Idea

The parties dispute whether claim 5 is directed to an abstract idea and if it is characterized by claim 1.  Telinit urges that claim 1 is not representative of claim 5 because it contends the terms "signaling component" and "status component" from claim 5 require construction before patent-eligibility can be addressed.  Docket No. 41 at 8–9.  However, both parties' arguments regarding whether claim 5 recites an abstract idea is indistinguishable from the arguments regarding claim 1.

Claim 1 and 5 are closely related and cover the same well-known and widely-understood concept—making a telephone call—and the above analysis regarding whether claim 1 recites an abstract idea holds true for claim 5.  As a system claim, claim 5 is, on its face, distinguishable from the method in claim 1.  *See* '123 Patent at 10:18–32.  Further, unlike claim 1, claim 5 recites various "components" needed for "initiating telephone calls" over the Internet.  *See id.* Yet those "components" are merely structures of a general purpose computer to effectuate carrying out the steps of the claim.  *See id.*  For substantially the same reasons discussed above for claim 1, claim 5 is not rooted in specific technology, nor does it does solve a problem particular to the Internet.  Thus, claim 5 is also directed to an abstract idea.

### B.  Inventive Concept

As with the abstract idea prong, both parties' arguments regarding an "inventive concept" in claim 5 are virtually indistinguishable from the arguments pertaining to claim 1.  In addition to the above arguments regarding claim 1, Telinit argues that "claim 5 of the '123 Patent recites specific ways of using input components, processing components, signaling components, monitoring components, and status components that amount to significantly more than any

underlying abstract idea." Docket No. 41 at 20.

Telinit's arguments with regard to claim 5 are solely focused around the recited "components" adding concrete limitations to the claim. However, Telinit's arguments that those components add transformative elements do not transform claim 5 into an inventive concept. For example, the parties agree that the recited "signaling component" is "a server that sends an electronic signal to a telephone switch." *See* Docket No. 66. Additionally, for the reasons stated above, a "status component" is "a server that provides an indication of a change in a connection." These structures do not provide any meaningful technical limitations to claim 5. *Alice*, 134 S. Ct. at 2358. Without the minor computer-based limitations, claim 5 merely recites what a telephone operator would do at a switchboard. Accordingly, claim 5 of the '123 Patent is invalid for failure to recite patent-eligible subject matter under 35 U.S.C. § 101.

## III.    Patent-Eligibility of the Remaining Dependent Claims

The remaining dependent claims of the '123 Patent similarly fail to recite patent-eligible subject matter because they add no meaningful limitations to either claim 1 or 5. Claims 2 through 4 merely add sub-elements with generic computer terms and processes to the first three elements of claim 1. For example: the "receiving" element of claim 1 corresponds to claim 3 with the added sub-element of "providing a web page for user input and request selection"; the "identifying" element corresponds to claim 4 with the added sub-element of "accessing a stored database in accordance with the data network request"; and the "signaling" element corresponds to claim 2 with the added sub-element of "connecting an instrument identified by the user telephone number to the call." *See* '123 Patent at 10:7–17.

Claims 6 through 8 are structured similarly to claims 2 through 4, with the "signaling," "input," and "processing" components of claim 5 given additional limitations in claims 6 through

8.  *See id.* at 10:33–45.  Similar to claims 5 and 2 through 4, claims 6 through 8 merely add basic "components" and functions of a general purpose computer or network device to effectuate carrying out the steps of the claims.  Such generic additions do not render a claim patent-eligible.  Accordingly, the dependent claims of the '123 Patent fail to recite patent-eligible subject matter.

## IV.     The Machine-or-Transformation Test

The parties both argue whether or not the claims of the '123 Patent (in its entirety) are patent-eligible under the machine-or-transformation test.  *See* Docket Nos. 31 at 15–17 and 41 at 22–24.  The Supreme Court in *Bilski* made it clear that "[t]he machine-or-transformation test is not the sole test for deciding whether an invention is a patent-eligible 'process.' "  *Bilski*, 561 U.S. at 604.  The machine-or-transformation test is "a useful and important clue, an investigative tool," for determining patentability.  *Id.*  For the reasons stated above, claim 1 of the '123 Patent is not "tied to a particular machine or apparatus" nor does it "operate to change articles or materials to 'a different state or thing.' "  *Gottschalk v. Benson*, 409 U.S. 63, 71 (1972); *see Alice*, 134 S. Ct. at 2358–59; *see also DDR Holdings*, 773 F.3d at 1256 ("recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible" (citing *Alice*).  Accordingly, the machine-or-transformation test does not aid the Court in determining whether or not claim 1 of the '123 Patent recites patent-eligible subject matter.

## CONCLUSION

For the reasons stated above, Jive's Motion and Supporting Brief for Judgment on the Pleadings that U.S. Patent Number 6,192,123 is Invalid for Claiming Ineligible Subject Matter Under 35 U.S.C. § 101 is **GRANTED**.  Furthermore, the parties are **ORDERED** to meet and confer and file a joint status update regarding any remaining causes of action and requests to amend the Docket Control Order no later than **September 30, 2015**.

**So ORDERED and SIGNED this 21st day of September, 2015.**


ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

## APPENDIX A

### United States Patent Number 6,192,123 (the '123 Patent):

| Claim Term | Court's Construction |
|---|---|
| data network request | a network request sent via a data network, which is a TCP/IP network designed to transfer information encoded as digital data signals |
| signaling component | a server that sends an electronic signal to a telephone switch |
| means configured to provide a web page for user input and request selection | means-plus-function term: the claimed function is "to provide a web page for user input and request selection," and the corresponding structure is "web server 210, and equivalents thereof" |
| voice network | a telephone network capable of conveying speech encoded as voice signals |
| instrument | terminal device that is capable of at least receiving a voice call |
| user telephone number | a set of numerical digits that identify a particular node within a voice network |
| switch | a device that can selectively make or break a connection between nodes in a voice network |
| input component | plain meaning |
| monitoring component | a server that checks for changes in a connection |
| status component | a server that provides an indication of a change in a connection |
| means configured to connect an instrument identified by the user telephone number to the call | means-plus-function term: the claimed function is "to connect an instrument identified by the user telephone number to the call," and the corresponding structure is "telephone switch 220, and equivalents thereof" |